642 A.2d 947

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. EILEEN PIERCE, DEFENDANT–APPELLANT.

Argued September 28, 1993—Decided June 15, 1994.

*M. Virginia Barta,* Assistant Deputy Public Defender, argued the cause for appellant (*Zulima V. Farber,* Public Defender, attorney).

*Linda A. Rinaldi,* Deputy Attorney General, argued the cause for respondent (*Fred DeVesa,* Acting Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

This appeal concerns the scope of a police officer's authority to conduct a search of articles contained in the passenger compartment of an automobile following the arrest of the driver for operating the vehicle while his license is suspended. See *N.J.S.A.* 39:3–40. The State supports the validity of the search by relying on *New York v. Belton,* 453 *U.S.* 454, 101 *S.Ct.* 2860, 69 *L.Ed.*2d 768 (1981), which held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460, 101 *S.Ct.* at 2864, 69 *L.Ed.*2d at 775 (footnote omitted). Defendant contends that both the custodial arrest of the driver and the incidental search of the vehicle constituted violations of rights protected by the Fourth Amendment of the United States Constitution and article I, paragraph 7 of the New Jersey Constitution.

Following denial of her motion to suppress evidence, defendant, Eileen Pierce, pleaded guilty to possession of cocaine pursuant to a plea agreement, and the court sentenced her to three years probation. A divided panel of the Appellate Division affirmed the judgment of conviction. *State v. Pierce,* 257 *N.J.Super.* 483, 608 *A.*2d 952 (1992). Defendant appeals to this Court as of right. *R.* 2:2–1(a).

I

The facts are essentially undisputed. On August 19, 1989, Officer Rette of the Manalapan Township Police Department

stopped a 1986 Ford van owned and operated by co-defendant Nicholas Grass for speeding, the officer having clocked the vehicle's speed at fifty-one miles per hour in a forty-mile-per-hour zone. The other occupants of the vehicle were defendant, Pierce, and co-defendant Eugene Bernardo. The officer requested and received Grass's Pennsylvania driver's license and vehicle registration. Officer Rette communicated by radio with his headquarters, and learned that Grass's driver's license had been suspended. The officer then ordered Grass to step out of the van and informed Grass that he was arresting him for driving an automobile while his license was suspended. Officer Rette conduced a pat-down search of Grass, handcuffed him, and placed him in the rear of his patrol car, which he had parked directly behind the van.

Officer Rette returned to the van and ordered Pierce and Bernardo to get out of the vehicle and to produce identification. Pierce stated that she had no identification; Bernardo produced a New Jersey driver's license. The officer conducted a pat-down search of both passengers to determine if they were armed, and found no weapons. By this time, a state trooper and a police officer from another municipality had arrived on the scene to provide back-up.

Officer Rette then entered the van to search its interior while the back-up officers secured Pierce and Bernardo behind the van. He first observed a "large hunting-type knife" on the front console. The officer also saw behind the driver's seat a metal camera case with two latches, one fastened and the other unfastened. He opened the case and found a revolver with "four loaded rounds of .357 magnum ammunition and also two spent rounds." The officer also found in the van "two breed member motorcycle gang jackets and a companion jacket that would be the female of a breed member." Officer Rette testified that the jacket he identified as "the female's jacket * * * had a patch on the back stating 'Nick's property.'" The officer stated that he found in a pocket of that jacket a cellophane packet containing a trace amount of white powder that laboratory tests later showed to be cocaine. The

officer testified that he had searched the van within two or three minutes after he had handcuffed Grass and secured him in the patrol car.

Bernardo and Pierce were arrested and, together with Grass, were indicted for unlawful possession of a weapon without a permit, in violation of *N.J.S.A.* 2C:39–5b; receiving stolen property (the revolver), contrary to *N.J.S.A.* 2C:20–7a; and possession of cocaine, in violation of *N.J.S.A.* 2C:35–10a(1). After the trial court denied Pierce's motion to suppress the evidence secured during the search of the van, Pierce entered a plea of guilty to the cocaine charge and received a three-year probationary term. The court dismissed the charges against Bernardo. Grass pled guilty to possession of a handgun without a permit, and the court sentenced him to four years imprisonment. The Appellate Division affirmed the judgment of conviction following denial of Grass's motion to suppress the fruits of the search of the van. *State v. Grass,* 250 *N.J.Super.* 74, 593 *A.*2d 379 (1991).

On Pierce's appeal from the judgment of conviction entered after the denial of her suppression motion, the Appellate Division majority, relying on the decision in *Grass, supra,* applied the bright line rule of *New York v. Belton* to sustain the search of the van as incidental to the arrest of Grass for driving with a suspended license. 257 *N.J.Super.* at 485, 608 *A.*2d 952. The majority cautioned, however, that the bright-line *Belton* rule combined with the statutory authorization to law-enforcement officers to arrest without a warrant any person violating any provision of Chapter 3 or 4 of Title 39 of the New Jersey statutes, "create[s] a potential for abuse." *Ibid.* The majority noted that unrestricted application of the statutory authority to arrest for motor-vehicle violations "would permit a law enforcement officer to convert any prosaic motor vehicle violation into an occasion for the full search of the automobile * * *." *Id.* at 485–86, 608 *A.*2d 952. However, based on the seriousness of Grass's motor-vehicle offense, the Appellate Division majority concluded that the officer's arrest of Grass had constituted an appropriate exercise of the statutory

authority to arrest for motor-vehicle violations, thereby validating the contemporaneous search of the van. *Id.* at 486, 608 *A.*2d 952.

Dissenting, Judge Pressler expressed doubt that New Jersey courts should read *Belton* to authorize a vehicle search merely on the basis of a lawful arrest of the driver for a routine traffic violation, noting that this Court had never expressed its agreement with so broad a reading of *Belton. Id.* at 487–88, 608 *A.*2d 952. In addition, Judge Pressler concluded that the arrest of the driver only for driving while on the revoked list, absent any other suspicious circumstances or a reasonable belief that the driver would not respond to a summons, was an unlawful arrest in violation of the Fourth Amendment, rendering the related warrantless search of the vehicle unreasonable and invalid. *Id.* at 488–93, 608 *A.*2d 952.

## II

### A

#### *Validity of Arrests for Motor–Vehicle Offenses*

New Jersey is one of a number of states that have enacted statutes unqualifiedly authorizing police officers to arrest motorists who commit traffic offenses. *See* Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses,* 62 *Temp.L.Rev.* 221, 250 n. 188, 251 n. 189 (1989) (listing twenty-eight state statutes that unconditionally authorize arrests for traffic offenses and twenty-two state statutes that impose limitations on police authority to arrest for such offenses). *N.J.S.A.* 39:5–25 provides:

> Any constable, sheriff's officer, police officer, peace officer, or the director may, without a warrant, arrest any person violating in his presence any provision of chapter 3 of this Title, or any person, other than a motorman or person having control of a street car or auto bus, running upon a route approved by the Board of Public Utilities, violating in his presence any provision of chapter 4 of this Title. The exemption from arrest of a motorman or person having control of a street car or auto bus, as conferred herein, shall not operate to prevent his arrest, however,

for a violation of R.S. 39:4–50. The arresting officer shall bring any person so arrested before any judge of the municipal court of the municipality wherein the offense was committed, or before the director at any place designated as his office. If the arrest is for a violation of R.S. 39:4–50, the arresting officer may, if no judge, clerk or deputy clerk is available, detain the person arrested, either in any police station, lockup or other place maintained by any municipality for the detention of offenders or in the common jail of the county, for such reasonable time as will permit the arresting officer to obtain a warrant for the offender's further detention, which temporary detention shall not exceed 24 hours from the time of the arrest. If the arrest is for a violation of any other provision of this subtitle, the person arrested shall be detained in the police station or municipal court until the arresting officer makes a complaint and a warrant issues.

Any constable, sheriff's officer, police officer, peace officer, or the director may, instead of arresting an offender as herein provided, serve upon him a summons. [Footnotes omitted.]

Although *N.J.S.A.* 39:5–25 authorizes both issuance of a summons and arrest for the violations to which it applies, the statute does not contain provisions that suggest whether arrest or a summons is appropriate. Read literally, the statute authorizes police officers to arrest any person who violates, in the officer's presence, *any* provision of Chapter 3 or 4 of Title 39, an authorization encompassing a myriad of significant as well as trivial traffic regulations. For example, an officer could arrest a motorist whose vehicle was not equipped with adequate license-plate illumination, in violation of *N.J.S.A.* 39:3–61, or who failed to signal for a turn continuously for the last 100 feet before the turn, contrary to *N.J.S.A.* 39:4–126, or who parked within fifty feet of a stop sign, a violation of *N.J.S.A.* 39:4–138h. Our common experience informs us that arrests for routine motor-vehicle violations occur only rarely, and that the standard police practice is to detain the offending driver only for the interval required for issuance of a summons.

Nevertheless, the issue potentially may be one of constitutional dimension. As Justice Stewart noted in *Gustafson v. Florida*, 414 *U.S.* 260, 94 *S.Ct.* 488, 38 *L.Ed.*2d 456 (1973), which involved the validity of a search of the driver's person following an arrest for driving without an operator's license,

[i]t seems to me that a persuasive claim might have been made in this case that the custodial arrest of the petitioner for a minor traffic offense violated his rights

under the Fourth and Fourteenth Amendments. But no such claim has been made. Instead, the petitioner has fully conceded the constitutional validity of his custodial arrest.

[*Id.* at 266–67, 91 *S.Ct.* at 492, 38 *L.Ed.2d* at 462 (Stewart, J., concurring).]

Similarly, in *United States v. Guzman*, 864 *F.*2d 1512 (1988), in respect of a driver stopped and detained for failing to wear a seat belt, the Tenth Circuit noted that " '[t]here can be no question that the stopping of a vehicle and the detention of its occupants constitute a "seizure" within the meaning of the Fourth Amendment.' " *Id.* at 1519 (alteration in original) (quoting *Colorado v. Bannister*, 449 *U.S.* 1, 4 n. 3, 101 *S.Ct.* 42, 43 n. 3, 66 *L.Ed.2d* 1, 4 n. 3 (1980)). We acknowledge that the Legislature's unqualified authorization of police officers to arrest for any traffic offense constitutes an assertion of the State's police power to promote public safety and the general welfare. See *State, Dep't of Envtl. Protection v. Ventron Corp.*, 94 *N.J.* 473, 499, 468 *A.2d* 150 (1983). Nevertheless, that exercise of the police power could be invalid if it were applied in a manner "repugnant to the fundamental constitutional rights guaranteed to all citizens." *Gundaker Cent. Motors v. Gassert*, 23 *N.J.* 71, 79, 127 *A.2d* 566 (1956), *appeal dismissed*, 354 *U.S.* 933, 77 *S.Ct.* 1397, 1 *L.Ed.2d* 1533 (1957).

Although *N.J.S.A.* 39:5–25 imposes no limitations on an officer's power to arrest for traffic offenses, other sources of law suggest standards that should inform police officers in the exercise of their statutory authority. For example, *Rule* 3:3–1 of the Rules Governing Criminal Practice sets forth guidelines to assist a court authorized to issue either a summons or an arrest warrant based on a complaint alleging commission of an offense. Absent a complaint alleging commission of one of the offenses designated by the Code of Criminal Justice ("Code"), the Rule prescribes that a court should issue a summons rather than an arrest warrant unless one of the following conditions exist:

(2) The accused has previously failed to respond to a summons;

(3) The judge or clerk has reason to believe that the accused is dangerous to himself, to others or to property;

(4) There are one or more outstanding arrest warrants for the accused;

(5) The whereabouts of the accused are unknown and an arrest warrant is necessary to subject him to the jurisdiction of the court; or

(6) The judge or clerk has reason to believe that the accused will not appear in response to a summons.

[*R.* 3:3–1(b).]

Substantially similar standards are contained in *Rule* 3:4–1 to guide officers who have made warrantless arrests in determining whether to apply to the court for a summons or an arrest warrant in respect of the arrested person. The 1980 Report of the Supreme Court's Committee on Criminal Practice explained that the proposed revisions of *Rules* 3:3–1 and 3:4–1 establish "a presumption regarding when a summons should issue, subject to rather broad exceptions where there is a need for further investigation, detention or avoidance of public danger." *Report,* Supreme Court's Committee on Criminal Practice, 105 *N.J.L.J.* 425, 426 (1980).

Similarly, the American Bar Association, in its Standards for Criminal Justice, advocates that police officers authorized to arrest for misdemeanors issue a summons unless an arrest is necessary to prevent bodily harm to the accused or another or if the accused's conduct or prior record demonstrates a likelihood that the accused will fail to respond to a summons. 2 *Standards for Criminal Justice* standard 10–2.2 (2d ed. Supp.1986) (hereinafter ABA *Standards* ). The commentary to standard 10–2.2 observes: "[T]he decision concerning the necessity for arrest should not be left to the untrammeled discretion of the arresting officer. A standard that permits officers to arrest or not according to their personal assessment of a defendant is bound to lead to unequal enforcement of the laws." *Id.* at standard 10.26. Likewise, the 1987 revision of the Uniform Rules of Criminal Procedure, approved by the National Conference of Commissioners on Uniform State Laws, adopts essentially the same restrictive standards for non-felony arrests as are set forth in the ABA *Standards. Unif. R.Crim.P.* 211(b); *see also Model Code of Pre–Arraignment Procedure* § 120.2(4) (1975) (advocating police regulations encouraging use of citations rather than arrest except when necessary in

public interest); *Unif. Vehicle Code and Model Traffic Ordinance* § 16–202 (1992) (permitting arrest only for serious traffic offenses including vehicular homicide, reckless driving, eluding officer, driving under influence of drugs or alcohol, or failing to stop or give information after accident).

Although the issue appears to be one of first impression in New Jersey, courts in other jurisdictions have acknowledged that detention or arrest may be improper in respect of offenses that pose little threat to public safety. See, *e.g.*, *United States v. Mota*, 982 *F.*2d 1384, 1388–89 (9th Cir.1993) (holding arrest of defendants for selling hot corn-on-the-cob from shopping cart without required license violative of both California law and Fourth Amendment and therefore suppressing evidence obtained from search conducted on basis of unlawful arrests); *Guzman, supra,* 864 *F.*2d at 1519–21 (holding that officer's stop, detention, and extensive questioning of defendant and wife based only on defendant's unlawful failure to wear seat belt while driving constituted unreasonable seizure, and remanding to trial court to determine voluntariness of defendant's consent to search); *Barnett v. United States*, 525 *A.*2d 197, 199 (D.C.1987) (holding arrest of defendant for violating traffic regulation prohibiting "walking as to create a hazard" invalid under District of Columbia Code and holding contemporaneous search of defendant that revealed narcotics violative of defendant's Fourth Amendment rights); *Thomas v. State*, 614 *So.*2d 468, 470–71 (Fla.1993) (holding that custodial arrest of defendant for violating municipal ordinance prohibiting operation of bicycle without bell or gong unreasonable and violative of defendant's rights under Fourth Amendment and Florida Constitution); *State v. Martin*, 253 *N.W.*2d 404, 406 (Minn.1977) (holding invalid under Minnesota Rules of Criminal Procedure arrest of defendant for petty misdemeanor offense of possession of small quantity of marijuana and invalidating contemporaneous search of defendant as violative of Fourth Amendment); *State v. Hehman*, 90 *Wash.*2d 45, 578 *P.*2d 527, 529 (1978) (invalidating arrest of defendant for driving with defective taillight and expired driver's license, holding custodial arrests for minor traffic violations con-

trary to state's public policy, and suppressing evidence of illegal drug possession obtained in course of contemporaneous search).

Moreover, a number of commentators have expressed concern about unchecked police authority to effect custodial arrests for minor offenses. Professor LaFave, noting the potential for abuse of that authority, suggests that constitutional limits are necessary:

> It may be that on a future occasion the Court will conclude that there are some constitutional limits upon the use of "custodial arrests" as the means for invoking the criminal process when relatively minor offenses are involved. Such a holding would be most desirable, as it would address specifically a current problem of considerable seriousness: the arbitrariness and inequality which attends unprincipled utilization of the "custodial arrest" and citation alternatives. Moreover, it would substantially diminish the opportunities for pretext arrests * * *.
>
> [2 Wayne R. LaFave, *Search and Seizure,* § 5.2(g), at 465 (2d ed. 1987) (citations omitted).]

Similarly, in an article addressing *United States v. Robinson,* 414 *U.S.* 218, 94 *S.Ct.* 467, 38 *L.Ed.*2d 427 (1973) (holding that after arrest of defendant for driving while on revoked list, search of the arrestee's person is reasonable under Fourth Amendment), Professor LaFave focused on the legality of the arrest:

> [I]t may well be that the overriding question presented by *Robinson* is not what degree of search may be conducted incident to arrest, but rather when an arrest itself is warranted so as to call for a full protective search. That is, if a full search for self-protection is necessary only in the event of arrest, then is not such a search unnecessary if the antecedent arrest was unnecessary? * * *
>
> * * * [T]he question is certainly overdue for consideration, for it cannot be denied that the "police decision to arrest an individual and initiate the process of criminal prosecution is in itself a significant invasion of personal liberty."
>
> [Wayne LaFave, *"Case-By-Case Adjudication" Versus "Standardized Procedures": The* Robinson *Dilemma,* 1974 *Sup.Ct.Rev.* 127, 158 (hereinafter LaFave, *Case-By-Case Adjudication* ) (quoting Edward L. Barrett, *Personal Rights, Property Rights, and the Fourth Amendment,* 1960 *Sup.Ct.Rev.* 46).]

*See also* Thomas R. Folk, *The Case for Constitutional Constraints Upon the Power to Make Full Custody Arrests,* 48 *Cinn.L.Rev.* 321, 343 (1979) (suggesting that custodial arrests for minor offenses violate Fourth Amendment unless necessary to ensure presence of arrestee at trial or to prevent injury to arrestee or others); Arthur Mendelson, *Arrest for Minor Traffic Offenses,* 19 *Crim.L.Bull.* 501, 510–11 (1983) (criticizing as violative of Fourth

Amendment state statutes that authorize custodial arrest for minor traffic offenses, and urging amendatory legislation to restrict police power to arrest); Salken, *supra,* 62 *Temp.L.Rev.* at 273–5 (1989) (concluding that exercise of power to conduct vehicular search based only on arrest for minor traffic offense violates Fourth Amendment, and urging that police authority to arrest for traffic offenses be restricted only to circumstances in which governmental interests require custodial arrest rather than issuance of summons); James B. White, *The Fourth Amendment as a Way of Talking About People: A Study of Robinson and Matlock,* 1974 *Sup.Ct.Rev.* 165, 208 (urging consideration of constitutionality of custodial arrests for minor offenses).

### B

### *New York v. Belton*

As noted *supra* at 188–189, 642 *A.*2d at 948–949, the Appellate Division upheld the search of the contents of Pierce's jacket pocket on the basis of the bright-line rule of *New York v. Belton, supra,* 453 *U.S.* 454, 101 *S.Ct.* 2860, 69 *L.Ed.*2d 768, which authorizes as an incident of the lawful arrest of a driver the contemporaneous search of the passenger compartment, including all containers, of the driver's vehicle. Approximately three-and-one-half months after the Supreme Court decided *Belton* this Court acknowledged that that holding appeared to be inconsistent with our decision in *State v. Welsh,* 84 *N.J.* 346, 419 *A.*2d 1123 (1980), in which "we reaffirmed that the proper scope of a search incident to an arrest is limited to the person of the arrestee and the area from within which he might gain possession of a weapon or destructible evidence." *State v. Alston,* 88 *N.J.* 211, 235 n. 15, 440 *A.*2d 1311 (1981) (citing *Chimel v. California,* 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.*2d 685 (1969)). Because the vehicle's occupant in *Welsh* had been placed under custodial arrest, seated in a police car, and hence unable to reach into his own vehicle to gain

possession of a weapon or destructible evidence, we noted in *Alston* that the search in *Welsh* could not have been sustained as one incident to a lawful arrest under the *Chimel* standard. We observed, however, that the result in *Welsh* "would not be the same" were we to apply the Court's holding in *Belton*. Because we upheld the search in *Alston* on different grounds, we expressly deferred consideration of *Belton*'s effect on this Court's search-and-seizure jurisprudence. *Ibid*.

A brief background perspective will explain the evolution of the Supreme Court's holding in *Belton*. Commencing with dictum in *Weeks v. United States*, 232 *U.S.* 383, 392, 34 *S.Ct.* 341, 344, 58 *L.Ed.* 652, 655 (1914) (acknowledging right of law-enforcement officials "to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime"), over the course of several decades the Supreme Court successively expanded and contracted the scope of police authority to conduct warrantless searches incident to arrests. See *Carroll v. United States*, 267 *U.S.* 132, 158, 45 *S.Ct.* 280, 287, 69 *L.Ed.* 543, 553 (1925) (approving search after arrest for "whatever is found upon his person or in his control"); *Agnello v. United States*, 269 *U.S.* 20, 30, 46 *S.Ct.* 4, 5, 70 *L.Ed.* 145, 148 (1925) (approving search after arrest of the person and "the place where the arrest is made"); *Marron v. United States*, 275 *U.S.* 192, 199, 48 *S.Ct.* 74, 77, 72 *L.Ed.* 231, 238 (1927) (approving, after arrest for offense occurring on premises, power to search extending "to all parts of the premises used for the unlawful purpose"); *Go–Bart Importing Co. v. United States*, 282 *U.S.* 344, 358, 51 *S.Ct.* 153, 158, 75 *L.Ed.* 374, 383 (1931) (disapproving search of office in which defendants were arrested); *Harris v. United States*, 331 *U.S.* 145, 154–55, 67 *S.Ct.* 1098, 1103, 91 *L.Ed.* 1399, 1408–09 (1947) (approving thorough search of four-room apartment incident to defendant's arrest therein for prior offense); *Trupiano v. United States*, 334 *U.S.* 699, 709, 68 *S.Ct.* 1229, 1234, 92 *L.Ed.* 1663, 1671 (1948) (disapproving seizure of items in plain view after entry to make arrest because of failure to secure and use search warrants); *United States v. Rabinowitz*, 339 *U.S.* 56, 63–66, 70 *S.Ct.* 430, 434–35, 94

*L.Ed.* 653, 658–60 (1950) (relying on *Harris, supra,* overruling *Trupiano, supra,* and upholding as reasonable thorough search of one-room office where arrest is made). Under the *Harris–Rabinowitz* rule as thereafter applied, warrantless searches incident to arrests were not limited to the area into which a defendant might reach to destroy evidence or secure a weapon, but extended to the entire area in which defendant exercised a possessory interest. *See Chimel, supra,* 395 *U.S.* at 760, 89 *S.Ct.* at 2038, 23 *L.Ed.*2d at 692; 2 LaFave, *Search and Seizure, supra,* § 6.3(b) at 623–24.

In 1969 the Supreme Court decided *Chimel,* overruling the *Harris–Rabinowitz* rule and restricting the constitutionally-permissible scope of a search incident to an arrest. *Chimel* involved the arrest at his home of a coin-shop burglary suspect by three police officers with an arrest warrant but no search warrant. Over the defendant's objections, the officers conducted a search of the entire three-bedroom house, including the attic, garage, and a small workshop. The police searched dresser drawers in the master bedroom and seized various items, including coins, that the trial court admitted in evidence against defendant during the burglary trial. The search continued for almost one hour. 395 *U.S.* at 753–54, 89 *S.Ct.* at 2030, 23 *L.Ed.*2d at 688. The California Supreme Court upheld the search as incidental to a valid arrest. *People v. Chimel,* 68 *Cal.*2d 436, 67 *Cal.*Rptr. 421, 425, 439 *P.*2d 333, 337 (1968). The Supreme Court reversed, holding the search invalid and overruling both *Harris, supra,* and *Rabinowitz, supra:*

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate

control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

[*Chimel, supra,* 395 *U.S.* at 762–63, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694 (footnote omitted).]

In 1981 the Court applied *Chimel*'s holding to an automobile search incident to the arrest of the occupants. *Belton, supra,* 453 *U.S.* 454, 101 *S.Ct.* 2860, 69 *L.Ed.*2d 768. A New York State trooper stopped a vehicle for speeding, and while examining the driver's license and registration smelled the odor of burned marijuana. The trooper also observed an envelope marked "Supergold" on the floor of the car and suspected that it contained marijuana. The trooper ordered the four occupants to step out of the car, and placed them under arrest for possession of marijuana. He patted down each of them, and directed them to stand in separate areas. Finding marijuana in the envelope, the trooper then searched each of the occupants and also searched the passenger compartment of the vehicle. A black leather jacket on the back seat belonged to Belton. When the trooper unzipped one of the pockets, he found cocaine. *Id.* at 455–56, 101 *S.Ct.* at 2861–62, 69 *L.Ed.*2d at 772.

After Belton was indicted for possession of a controlled dangerous substance, he moved to suppress the cocaine. Although the lower courts upheld the validity of the search, the New York Court of Appeals reversed, concluding that "[a] warrantless search of the zippered pockets of an unaccessible jacket may not be upheld as a search incident to a lawful arrest where there is no longer any danger that the arrestee or a confederate might gain access to the article." *People v. Belton,* 50 *N.Y.*2d 447, 429 *N.Y.S.*2d 574, 575, 407 *N.E.*2d 420, 421 (1980).

Acknowledging that both state and federal courts had experienced difficulty in determining the proper scope of a vehicular

search incident to a lawful arrest, *Belton, supra,* 453 *U.S.* at 459 n. 1, 101 *S.Ct.* at 2863 n. 1, 69 *L.Ed.*2d at 774 n. 1, the Supreme Court endorsed the view that Fourth Amendment protections " 'can only be realized if the police are acting under a set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.' " *Id.* at 458, 101 *S.Ct.* at 2863, 69 *L.Ed.*2d at 773 (quoting LaFave, *Case–By–Case Adjudication, supra,* 1974 *Sup.Ct.Rev.* at 142). The Court, stressing its adherence to "the fundamental principles established in the *Chimel* case," *id.* at 460 n. 3, 101 *S.Ct.* at 2864 n. 3, 69 *L.Ed.*2d at 775 n. 3, adopted "the generalization that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].' " *Id.* at 460, 101 *S.Ct.* at 2864, 69 *L.Ed.*2d at 775 (quoting *Chimel, supra,* 395 *U.S.* at 763, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694). Accordingly, the Court upheld the validity of the Belton search, holding

that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile [and]

\* \* \* may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach.

[*Id.* at 460, 101 *S.Ct.* at 2864, 69 *L.Ed.*2d at 775 (footnotes omitted).]

The Court defined "container" as "any object capable of holding another object," and as including "closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like." *Id.* at 460 n. 4, 101 *S.Ct.* at 2864 n. 4, 69 *L.Ed.*2d at 775 n. 4. The Court's holding encompassed only the interior of an automobile's passenger compartment, not the trunk. *Ibid.*

In applying the *Belton* rule, federal courts have generally sustained vehicular searches even if the arrestee has been removed from the vehicle and handcuffed. *See, e.g., United States v. White,* 871 *F.*2d 41, 44–45 (6th Cir.1989); *United States v. Karlin,*

852 *F.*2d 968, 970–72 (7th Cir.1988), *cert. denied,* 489 *U.S.* 1021, 109 *S.Ct.* 1142, 103 *L.Ed.*2d 202 (1989); *United States v. Cotton,* 751 *F.*2d 1146, 1148 (10th Cir.1985); *United States v. Collins,* 668 *F.*2d 819, 821 (5th Cir.1982); cf. *United States v. Vasey,* 834 *F.*2d 782, 787 (9th Cir.1987) (holding search invalid as not contemporaneous with arrest of defendant who was handcuffed and secured in police car thirty to forty-five minutes prior to search).

The Court's holding in *Belton* has been widely criticized. Professor LaFave, whose endorsement of bright-line rules to guide police officers in resolving Fourth Amendment issues the *Belton* majority quoted approvingly, *id.* at 458, 101 *S.Ct.* at 2860, 69 *L.Ed.*2d at 773–74, concludes that *Belton* "does a disservice to the development of sound Fourth Amendment doctrine." Wayne R. LaFave, *The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith",* 43 *U.Pitt.L.Rev.* 307, 325 (1982). He observes that because the automobile search authorized by *Belton* is not based on probable cause, the decision creates the risk that "police will make custodial arrests which they otherwise would not make as a cover for a search which the Fourth Amendment otherwise prohibits." 3 LaFave, *supra, Search and Seizure* § 7.1(c), at 21. Other commentators have noted the inconsistency between the *Belton* rule and the "grabbing area" restriction imposed by *Chimel, supra:*

> If any bright line rule had been necessary to resolve the issue in *Belton,* it would have been the opposite of the rule that the Court announced. * * * [O]ccupants almost invariably are removed before an automobile is searched; and once they have been removed, there is no longer much chance that they can secure weapons from the automobile or destroy evidence there.
>
> [Albert W. Alschuler, *Bright Line Fever and the Fourth Amendment,* 45 *V. of Pitt.L.Rev.* 227, 274 (1984).]

*See also* Jeffrey A. Carter, *Fourth Amendment—Of Cars, Containers and Confusion,* 72 *J.Crim.L. & Criminology* 1171, 1173, 1217–21 (1981) (characterizing *Belton* as "disappointing," efficacy of its bright-line rule "questionable," and its legacy "confusion"); Catherine Hancock, *State Court Activism and Searches Incident to Arrest,* 68 *Va.L.Rev.* 1085, 1130–31 (1982) (observing that "[by]

the elimination of *Chimel*'s case-by-case measure of grabbing areas * * * *Belton* dramatically lowered the level of Fourth Amendment protection afforded to motorists in almost every state"); Yale Kamisar, *The "Automobile Search" Cases: The Court Does Little to Clarify the "Labyrinth" of Judicial Uncertainty, in* 3 *The Supreme Court: Trends and Developments 1980–81* 96 (Jesse Chaper et al. eds., 1982) (arguing that "automobile exception" recognized in *Carroll, supra,* 267 *U.S.* at 147, 45 *S.Ct.* at 283, 69 *L.Ed.* at 548–49, and based on probable cause constituted preferable basis for authorizing warrantless search in *Belton* ); John Parker, *Robbins and Belton—Inconsistency and Confusion Continue to Reign Supreme in the Area of Warrantless Vehicle Searches,* 19 *Hous.L.Rev.* 527, 552 (1982) (arguing that "[r]easonableness and exigency have given way to predictability in *Belton* "); David S. Rudstein, *The Search of an Automobile Incident to an Arrest: An Analysis of* New York v. Belton, 67 *Marq.L.Rev.* 205, 232, 261 (1984) (reading *Belton* to allow car search even if arrestee handcuffed and placed in squad car and urging reconsideration of *Belton* and return to rationale of *Chimel,* allowing search of vehicle and containers therein only if within potential control of arrestee); David M. Silk, *When Bright Lines Break Down: Limiting* New York v. Belton, 136 *U.Pa.L.Rev.* 281, 313 (1987) (hereinafter Silk) (urging that *Belton* be read and applied narrowly and not expanded beyond intended scope); Robert Stern, *Robbins v. California and New York v. Belton: The Supreme Court Opens Car Doors to Container Searches,* 31 *Am.U.L.Rev.* 291, 317 (1982) (describing *Belton* as subordinating privacy interests to bright-line rule and allowing warrantless searches of containers in automobile passenger compartments incident to arrest of driver or occupants); *The Supreme Court, 1980 Term,* 95 *Harv.L.Rev.* 93, 260 (1981) (noting that "the Court has turned its back on the logic of its earlier decision in *Chimel* * * *, which restricted police searches incident to arrest to the arrestee's immediate area of control").

Most of the state courts that have addressed the issue apply the *Belton* rule, *see* Silk, *supra,* 136 *U.Pa.L.Rev.* at 292 n. 81, although

several state courts have declined to follow *Belton*. See, *e.g.*, *State v. Hernandez*, 410 *So.*2d 1381, 1385 (La.1982) (distinguishing *Belton*, but observing that "we do not consider [*Belton* ] to be a correct rule of police conduct under our state constitution"); *Commonwealth v. Toole*, 389 *Mass.* 159, 448 *N.E.*2d 1264, 1266–68 (1983) (excluding evidence obtained by warrantless search of truck following lawful arrest, removal, and handcuffing of driver and acknowledging validity of search under *Belton* but invalidating search based on Massachusetts statute limiting police authority to search incident to arrest only to evidence of crime for which arrest is effected or to seize weapons arrestee might use to resist arrest); *People v. Blasich*, 73 *N.Y.*2d 673, 543 *N.Y.S.*2d 40, 44–45, 541 *N.E.*2d 40, 44–45 (1989) (upholding search but observing that New York rejects *Belton* bright-line rule and interprets state constitution to limit warrantless searches of automobiles incident to arrests only to area from which arrestee might actually gain possession of weapon or destructible evidence); *State v. Gilberts*, 497 *N.W.*2d 93, 97 (N.D.1993) (holding invalid warrantless search of jacket "draped down around [passenger's] back," that passenger was "kind of sitting on," following arrest of driver for driving while on suspended list, and finding *Belton* inapplicable to search of jacket obviously belonging to passenger not implicated in offense for which driver was arrested); *State v. Brown*, 63 *Ohio St.*3d 349, 588 *N.E.*2d 113, 114–15 (invalidating warrantless search of automobile's glove compartment following arrest of defendant for driving while intoxicated and removal into patrol car; declining to follow *Belton* and holding that under Ohio constitution arrest for traffic offense does not automatically authorize detailed search of arrestee's automobile), *cert. denied*, —— *U.S.* ——, 113 *S.Ct.* 182, 121 *L.Ed.*2d 127 (1992); *State v. Kirsch*, 69 *Or.App.* 418, 686 *P.*2d 446, 448-9 (1984) (upholding reasonableness of car search incident to valid arrest; observing that "*Belton* is not the law of Oregon" and that Oregon Constitution authorizes car search incident to arrest only if necessary to protect officer or to preserve evidence, or if relevant to crime for which arrest is made and reasonable in light of facts); *State v. Stroud*, 106 *Wash.*2d 144, 720

*P.*2d 436, 440–41 (1986) (upholding warrantless search of unlocked glove compartment incident to arrest for theft; modifying *Belton,* and holding that Washington Constitution authorizes warrantless searches of automobile passenger compartment incident to valid arrest but excluding locked containers and locked glove compartment).

This Court has not previously had occasion to consider and apply *Belton,* although we have frequently referred to the Fourth Amendment exception that it established. See, *e.g., State v. Colvin,* 123 *N.J.* 428, 435, 587 *A.*2d 1278 (1991) (noting that "the *Belton* exception for a search incident to an arrest is conceptually distinct from the exception for automobile searches. In the former, there need be no probable cause to believe that the vehicle contains contraband."); *State v. Lund,* 119 *N.J.* 35, 38, 573 *A.*2d 1376 (1990) (distinguishing search during routine traffic stop from *Belton* search incident to lawful arrest); *State v. Esteves,* 93 *N.J.* 498, 503, 461 *A.*2d 1128 (1983) (distinguishing *Belton* ); *Alston, supra,* 88 *N.J.* at 235 n. 15, 440 *A.*2d 1311) (declining to consider effect of *Belton* on *Welsh, supra,* 84 *N.J.* 346, 419 *A.*2d 1123).

In *State v. Kearney,* 183 *N.J.Super.* 13, 443 *A.*2d 214 (1981), *certif. denied,* 89 *N.J.* 449, 446 *A.*2d 169 (1982), the Appellate Division applied the "philosophy" of *Belton* to sustain a search of defendant's jacket inside an automobile following defendant's arrest for possession of drugs. The Appellate Division noted that *Belton* had defined "container" to include "luggage, boxes, bags, clothing and the like." *Id.* at 20, 443 *A.*2d 214. Observing that "[t]he impact of *Belton* in this State is uncertain," the court sustained the search of defendant's jacket and acknowledged that "[w]e follow *Belton* in this case, to the extent that its philosophy may be applicable * * *." *Ibid.* In *State v. Barksdale,* 224 *N.J.Super.* 404, 415–16, 540 *A.*2d 901 (App.Div.1988), police officers arrested the operator of a vehicle for driving while on the suspended list, handcuffed him, and placed him in the patrol car; because the car stalled, the officers ordered the occupants to push the car into a nearby parking lot. Ten or fifteen minutes after the

arrest, police officers searched the passenger compartment and discovered drugs. Affirming the trial court's suppression of the evidence, the Appellate Division, based on the delay between the arrest and the search, concluded that the search was not "a contemporaneous incident of that arrest" within the contemplation of *Belton. Id.* at 415, 540 *A*.2d 901. The Appellate Division also observed that the police had "no reasonable belief that any occupant of the vehicle was armed and dangerous." *Ibid.* Noting that the driver had been handcuffed and placed in the back seat of the patrol car, the court also concluded "that the search was not properly limited to the area within [the driver's] immediate control." *Id.* at 416, 540 *A*.2d 901.

No case has heretofore required us to consider the *Belton* holding in the context of our State Constitution because most warrantless automobile searches conducted by police officers are sustainable on other grounds. Our courts have relied primarily on the automobile exception first established in *Carroll, supra,* 267 *U.S.* 132, 45 *S.Ct.* 280, 69 *L.Ed.* 543, which "holds a search warrant unnecessary when the police stop an automobile on the highway and have probable cause to believe that it contains contraband or evidence of a crime." *Alston, supra,* 88 *N.J.* at 230–31, 440 *A*.2d 1311; *see Colvin, supra,* 123 *N.J.* at 437, 587 *A*.2d 1278; *Esteves, supra,* 93 *N.J.* at 505–07, 461 *A*.2d 1128; *cf. State v. Patino,* 83 *N.J.* 1, 9–15, 414 *A*.2d 1327 (1980) (holding that police officers lacked probable cause sufficient to sustain search of automobile trunk under "automobile exception"). An obvious explanation for reliance by law-enforcement officials on the "automobile exception" is that the very same facts that constitute probable cause to arrest a vehicle's occupant often will afford police officers probable cause to believe that the vehicle contains evidence of crime or contraband. In that event, "a warrantless search of the vehicle is authorized, not as a search incident to arrest, but rather as a search falling within the automobile exception to the warrant requirement." *Blasich, supra,* 543 *N.Y.S.*2d at 43, 541 *N.E.*2d at 43.

In addition, we have applied the holding of *Michigan v. Long,* 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201 (1983), in which the Supreme Court sustained the validity of a weapons search in the passenger compartment of an automobile when the police officers had a reasonable belief that the driver posed a threat to their safety. The Court observed that a weapons search was "permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049, 103 *S.Ct.* at 3481, 77 *L.Ed.*2d at 1220 (quoting *Terry v. Ohio,* 392 *U.S.* 1, 21, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906 (1968)). In *Lund, supra,* we concluded that "the *Michigan v. Long* rule is sound and compelling precedent and should be followed to protect New Jersey's police community." 119 *N.J.* at 48, 573 *A.*2d 1376.

■ Hence, irrespective of the *Belton* rule, warrantless vehicle searches in New Jersey are sustainable either under the so-called "automobile exception" on the basis of probable cause, or in connection with a search for weapons based on an objectively-reasonable belief that an occupant of the vehicle is dangerous and may gain access to weapons. We must now determine whether our State Constitution will permit application of the *Belton* rule to sustain a warrantless vehicular search solely on the basis of an arrest for a motor-vehicle offense.

### III

### A

■ We first sustain the validity of the custodial arrest of co-defendant Grass for operating a motor vehicle during the period in which his driver's license had been suspended. See *N.J.S.A.* 39:3–40.

We concur with the observation of the Appellate Division majority that "[o]peration of a motor vehicle by a person whose license

is suspended is one of the more serious Title 39 offenses," 257 *N.J.Super.* at 486, 608 *A.*2d 952, and one that poses grave danger to the public. *See* Pat R. Gibert, *Suspended Drivers Imperil N.J. Highways, The Record,* May 15, 1994, at A–1 (detailing significant increases in number of motorists apprehended by police for driving with suspended licenses). We note that the Motor Vehicle Code authorizes suspension of a driver's license only for serious offenses, or an accumulation of offenses, that directly implicate the public safety. See, *e.g., N.J.S.A.* 39:4–49.1 (requiring two-year suspension for operation of motor vehicle while knowingly possessing controlled dangerous substances); *N.J.S.A.* 39:4–50 (imposing mandatory license suspensions for driving-while-intoxicated convictions; six months to one year for first offense, two years for second offense, and ten years for third offense); *N.J.S.A.* 39:4–56.1 to –56.2 (imposing mandatory license suspension of one to five years for willful abandonment of vehicle on public highway for purpose of obstructing passage of other vehicles); *N.J.S.A.* 39:5–30 (authorizing Director of Division of Motor Vehicles to impose preliminary and final suspension or revocation of driver's license for violations of specified statutes (*N.J.S.A.* 39:4–50, –96 to –98, –129) that have resulted in death or serious bodily injury of another); *N.J.A.C.* 13:19–10.2 (requiring Director of Division of Motor Vehicles to impose license suspensions of thirty days to not fewer than 180 days on drivers who accumulate prescribed number of points for motor-vehicle offenses within the periods designated).

The penalties that the Legislature has imposed for violations of *N.J.S.A.* 39:3–40, driving while on revoked list, reflect the seriousness of the offense. A first offender shall be fined $500, a second offender fined $750 and imprisoned for up to five days, and a third offender fined $1,000 and imprisoned for ten days. *N.J.S.A.* 39:3–40a to –40c. In addition, an offender's period of license suspension shall be extended up to six months. *N.J.S.A.* 39:3–40d. An offender involved in an accident that causes injury to another person in the course of violating *N.J.S.A.* 39:3–40 shall be imprisoned for not less than forty-five days. *N.J.S.A.* 39:3–40e.

Our cases have also recognized that violators of *N.J.S.A.* 39:3–40 pose a unique threat to public safety by knowingly operating a motor vehicle during a period in which the State has determined that they are unfit to drive. See, *e.g.*, *State v. Fearick,* 69 *N.J.* 32, 37, 350 *A.*2d 227 (1976) (observing that removing presumptively unsafe drivers from road furthers legislative goal of protecting public and suspended driver); see *State v. Handy,* 74 *N.J.Super.* 294, 299, 181 *A.*2d 203 (Cty.Ct.1962) ("[I]n violating *N.J.S.A.* 39:3–40 the offender asserts his defiance of public sanctions imposed for community safety before his fitness to drive again has been determined * * *"). Because danger to the public safety is one of the significant factors that informs a police officer's decision whether to arrest or issue a summons in respect of traffic offenses, *supra* at 190–193, 642 *A.*2d at 950–951, we would assume that police officers would generally, if not invariably, arrest persons driving while their licenses are suspended, in recognition of the potential hazard presented by one who operates a motor vehicle without State authorization. If no other licensed driver is in the vehicle, arresting the driver is consistent with an officer's duty to make certain that the offender cannot continue to drive. Even if other licensed drivers are present, the severity of the penalties imposed on those who drive while their license is suspended, including imprisonment for repeat offenders, would ordinarily justify the arrest of a violator of *N.J.S.A.* 39:3–40 in order to permit police officials to verify that the arrestee is likely to appear on the return date of the complaint. *See R.* 3:4–1(c) and (d).

As noted, however, *supra* at 190, 642 *A.*2d at 950, the broad statutory authorization to arrest those who commit any violation of the Motor Vehicle Code embraces offenses far less serious than that proscribed by *N.J.S.A.* 39:3–40, and the arbitrary and unreasonable exercise of the statutory arrest power in respect of minor traffic offenses could infringe on constitutionally-protected rights. Moreover, guidelines contained in our *Rules Governing Criminal Practice,* the ABA *Standards* and the *Uniform Rules of Criminal*

*Procedure,* see *supra* at 191–192, 642 *A.*2d at 950–951, advocate issuance of a summons to perpetrators of minor offenses unless arrest is necessary to protect public safety or to assure that the offender will respond to a summons. Accordingly, police officers and law-enforcement officials should not assume that the statutory authorization to arrest for motor-vehicle violations is unlimited or unreviewable. The exercise of the statutory power to make warrantless arrests for traffic offenses cannot arbitrarily and unreasonably infringe on "the fundamental constitutional rights guaranteed to all citizens." *Gassert, supra,* 23 *N.J.* at 79, 127 *A.*2d 566.

## B

Although we have not heretofore been required to determine whether the holding in *Belton* is compatible with the rights protected by article I, paragraph 7 of the New Jersey Constitution, we need not address that issue in our disposition of this appeal. Its resolution is not essential to our decision, and the issue is significant enough to warrant additional briefing and argument. Moreover, we infer that immediate resolution of that question is not essential because the justifications advanced for the majority of automobile searches that result in suppression motions are the "automobile exception," *supra* at 204, 642 *A.*2d at 957, and the doctrine of *Long, supra,* 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201, which permits vehicular searches based on police officers' reasonable belief that the driver or occupants pose a threat to their safety. *Supra* at 205, 642 *A.*2d at 958.

We hold only that under article I, paragraph 7 of the New Jersey Constitution the rule of *Belton* shall not apply to warrantless arrests for motor-vehicle offenses. Like its federal counterpart, that provision of our State Constitution prohibits unreasonable searches and seizures and constitutes an independent source for the protection of fundamental rights. Justice Pollock, concurring in *Lund, supra,* explained the complementary roles of federal

and state courts in the vindication of basic constitutional guarantees:

> Under our federalist system, a state-law analysis manifests no disrespect for federal courts as partners in protecting fundamental rights. The United States Supreme Court, charged as it is with establishing a basic level of protection for the entire nation, often is obliged to establish a lowest common denominator of such protection. The federalist system contemplates that state courts may grant greater protection to fundamental rights than is accorded under the federal constitution. When a state supreme court grants such protection, it does no more than fulfill its obligation to uphold its own constitution.

[119 <i>N.J.</i> at 52–53, 573 <i>A.</i>2d 1376.]

■ On several occasions this Court has determined that article I, paragraph 7 of our State Constitution affords greater protection against unreasonable searches and seizures than the federal Constitution affords. See, *e.g., State v. Hempele,* 120 *N.J.* 182, 576 *A.*2d 793 (1990) (holding invalid under State Constitution warrantless searches of garbage bags left on curb for collection); *State v. Novembrino,* 105 *N.J.* 95, 519 *A.*2d 820 (1987) (rejecting under State Constitution federal "good faith" exception to exclusionary rule for search warrants issued in good faith but without probable cause); *State v. Hunt,* 91 *N.J.* 338, 450 *A.*2d 952 (1982) (holding that State Constitution affords protectible interest in telephone-toll-billing records); *Alston, supra,* 88 *N.J.* 211, 440 *A.*2d 1311 (recognizing under State Constitution possessory interest in property as sufficient to confer standing to challenge validity of automobile search); *State v. Johnson,* 68 *N.J.* 349, 346 *A.*2d 66 (1975) (holding under State Constitution that validity of consent to search depends on knowledge of right to refuse consent). That body of decisional law reflects a steadily-evolving commitment by our State courts to provide enhanced protection for our citizens against encroachment of their right to be free from unreasonable searches and seizures. See *Hunt, supra,* 91 *N.J.* at 366–67, 450 *A.*2d 952 (Handler, J., concurring) (discussing state traditions as basis for application of State Constitution). That evolving commitment fortifies our conviction that we should not apply the rule of *New York v. Belton* in this State insofar as it purports to authorize

vehicular searches indiscriminately based only on contemporaneous arrests for motor-vehicle violations.

We rest that conclusion on several grounds. Initially, we note that the rationale for the Supreme Court's decision in *Chimel, supra*, 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.*2d 685, the analytical source for the Court's holding in *Belton*, is less persuasive when offered to justify the need for a vehicular search following an arrest for a traffic offense. The Court in *Chimel* observed that an arresting officer might reasonably search the arrestee and the adjacent area to remove weapons that the arrestee might use to effect escape or resist arrest, and to locate evidence pertinent to the arrest to prevent its concealment or destruction. *Id.* at 762–63, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694. That justification for a warrantless *vehicular* search diminishes significantly when the basis for the arrest is a routine violation of one of the motor-vehicle statutes.

We are mindful that police officers are at risk whenever they make a vehicular stop, and that a significant percentage of assaults on police officers occur in the course of traffic stops. *See Lund, supra*, 119 *N.J.* at 31, 573 *A.*2d 1376. Nevertheless, out of the substantial number of ordinary citizens who might on occasion commit commonplace traffic offenses, the vast majority are unarmed. Moreover, when the predicate offense is a motor-vehicle violation, the vehicle stopped by police would not ordinarily contain evidence at risk of destruction that pertains to the underlying offense, except in the case of violations of *N.J.S.A.* 39:4–50 (driving while intoxicated) and *N.J.S.A.* 39:4–49.1 (operating vehicle while possessing controlled dangerous substances). In addition, motorists arrested for traffic offenses almost invariably are removed from the vehicle and secured. When an arrestee, as was the case with Grass, has been handcuffed and placed in the patrol car, and the passengers are removed from the vehicle and frisked, the officer's justification for searching the vehicle and the passengers' clothing and containers is minimal. Thus, in the context of arrests for motor-vehicle violations, the bright-line *Belton* holding

extends the *Chimel* rule beyond the logical limits of its principle. Contrary to the view of our concurring colleague, *post* at 216, we reject ... We reject not the rationale of *Chimel*, but *Belton*'s automatic application of *Chimel* to authorize vehicular searches following all arrests for motor-vehicle offenses.

In a case decided seventeen years before *Belton*, the Appellate Division explained why a traffic offense was an inappropriate predicate for a warrantless search of the vehicle:

> In the instant case it is conceded that officer Reynolds stopped defendant's station wagon on the highway because it had a broken taillight and arrested the codefendant Hampson only because of his failure to have a driver's license in his possession. An arrest for such a violation of the motor vehicle laws, without more, is not sufficient cause for a search of the motor vehicle. A search incident to an arrest is authorized when it is reasonably necessary to protect the arresting officer from an assault, to prevent the prisoner from escaping, or to prevent the destruction of evidence of the crime—things [that] might easily happen where the weapon or evidence is on the accused's person or under his immediate control.
>
> However, the motor vehicle violations on the part of Hampson in the present case are not such offenses, in themselves, [that] raise the kind of inferences [that] justify searches in other cases. Surely the operator of a motor vehicle should not be required to submit to a search of his person or his automobile, merely because he parks too close to a fire hydrant, fails to stop at a stop sign, passes a red light, exceeds the speed limit, or commits like traffic violations.
>
> [*State v. Scanlon*, 84 *N.J.Super.* 427, 434–35, 202 *A.*2d 448 (1964) (citations omitted).]

We also perceive that the *Belton* rule, as applied to arrests for traffic offenses, creates an unwarranted incentive for police officers to "make custodial arrests which they otherwise would not make as a cover for a search which the Fourth Amendment otherwise prohibits." 3 LaFave, *supra*, *Search and Seizure* § 7.1(c) at 21. Justice Stevens, dissenting in *Robbins v. California*, 453 *U.S.* 420, 101 *S.Ct.* 2841, 69 *L.Ed.*2d 744 (1981), expressed that concern specifically in respect of *Belton*'s potential application to searches incident to traffic-related offenses:

> But if there were no reason to believe that anything more than a traffic violation had occurred, I should think it palpably unreasonable to require the driver of a car to open his briefcase or his luggage for inspection by the officer. The driver so compelled, however, could make no constitutional objection to a decision by the officer to take the driver into custody and thereby obtain justification for a search of the entire interior of the vehicle. Indeed, under the Court's new rule, the arresting officer may find reason to follow that procedure whenever he sees an

interesting looking briefcase or package in a vehicle that has been stopped for a traffic violation. That decision by a police officer will therefore provide the constitutional predicate for broader vehicle searches than any neutral magistrate could authorize by issuing a warrant.

[*Id.* at 451–52, 101 *S.Ct.* at 2859, 69 *L.Ed.*2d at 766–67.]

In that connection, we note that prior to *Belton* both federal and state courts routinely suppressed evidence obtained from vehicular searches incident to traffic arrests that were found to be pretextual, effected for the principal purpose of justifying the auto search. See, *e.g., Amador–Gonzalez v. United States,* 391 *F.*2d 308, 314 (5th Cir.1968) (suppressing narcotics discovered after arrest for speeding and improper left turn because "real purpose" for arrest was to search defendant's car); *Taglavore v. United States,* 291 *F.*2d 262, 265 (9th Cir.1961) (finding arrest on warrant for failure to signal and faulty brake lights used as mere excuse to search appellant for marijuana cigarettes); *People v. Molarius,* 146 *Cal. App.*2d 129, 303 *P.*2d 350, 351–52 (1956) (holding arrest for illegal u-turn pretextual, and suppressing narcotics discovered during vehicular search incident to arrest); *People v. Sapp,* 43 *Misc.*2d 81, 249 *N.Y.S.*2d 1020, 1023 (Cty.Ct.1964) (suppressing policy slips discovered during auto search following pretextual arrest for failing to give right-turn signal); *Ellsworth v. State,* 295 *P.*2d 296, 298 (Okla.Crim.App.1956) (reversing defendant's conviction for unlawful transportation of liquor, and suppressing evidence of liquor uncovered in search incident to pretextual arrest for minor traffic offense); *Holland v. State,* 93 *Okla.Crim.* 180, 226 *P.*2d 448, 450 (1951) (same); *Johnson v. State,* 92 *Okla.Crim.* 63, 220 *P.*2d 469, 471 (1950) (same); *State v. Michaels,* 60 *Wash.*2d 638, 374 *P.*2d 989, 992–93 (1962) (reversing conviction for illegal possession of gambling devices, and suppressing evidence obtained in auto search incident to pretextual arrest for failure to give turn signal); *Barnes v. State,* 25 *Wis.*2d 116, 130 *N.W.*2d 264, 269 (1964) (suppressing evidence of marijuana obtained in search incident to arrest for non-operational brakelight, and noting suspicion that arrest was mere pretext to justify search for narcotics); cf. *Guzman, supra,* 864 *F.*2d at 1518 (questioning whether officer's detention of defendant for failure to wear seat belt was objective-

ly-reasonable police conduct or mere pretext to justify subsequent vehicular search).

Prior to *Belton*, our Court did not sustain vehicular searches solely on the basis of arrests for motor-vehicle violations. As Chief Justice Weintraub observed in *State v. Boykins*, 50 *N.J.* 73, 77, 232 *A.*2d 141 (1967): "Surely not every traffic violation will justify a search of every part of the vehicle." *Accord State v. Slockbower*, 79 *N.J.* 1, 16–17, 397 *A.*2d 1050 (1979) (Schreiber, J., concurring). The general rule in state courts prior to *Belton* was that a vehicular search could not be justified solely on the basis of a contemporaneous traffic arrest. *Amador–Gonzalez, supra,* 391 *F.*2d at 315 n. 8; *see, e.g., People v. Superior Court of Yolo County,* 3 *Cal.*3d 807, 91 *Cal.Rptr.* 729, 478 *P.*2d 449, 453 (1970) (holding probable cause to arrest traffic offender insufficient basis to sustain warrantless search of vehicle); *State v. Cuellar,* 25 *Conn.Supp.* 229, 200 *A.*2d 729, 731 (1964) (holding arrest for driving without operator's license insufficient basis to sustain contemporaneous auto search that uncovered stolen property); *State v. Curtis,* 290 *Minn.* 429, 190 *N.W.*2d 631, 635 (1971) (holding, pre-*Belton,* that Fourth Amendment protects "against 'routine searches' arising out of ordinary traffic violations" and suppressing evidence of drugs obtained in vehicular search incident to arrest for failure to give turn signal); *Scanlon, supra,* 84 *N.J.Super.* at 434–35, 202 *A.*2d 448 (holding that arrest for motor-vehicle offense does not justify contemporaneous search of vehicle); *People v. Marsh,* 20 *N.Y.*2d 98, 281 *N.Y.S.*2d 789, 792, 228 *N.E.*2d 783 (1967) (stating, "The authority of the police to search a traveler on the highway may not be made to turn on whether the officer, *in the exercise of his discretion,* forthwith arrests the traffic offender instead of merely summoning him to court.").

■ Our holding that the *Belton* rule shall not apply indiscriminately to searches incident to warrantless arrests for motor-vehicle offenses poses no obstacle to law enforcement or to the ability of police officers to take precautions necessary for their safety. Thus, our holding does not affect the right of a police

officer, following a valid custodial arrest for a motor-vehicle viola-tion or for a criminal offense, to conduct a search of the person of the arrestee solely on the basis of the lawful arrest. *See Gustaf-son, supra,* 414 *U.S.* at 265–66, 94 *S.Ct.* at 491–92, 38 *L.Ed.*2d at 461; *Robinson, supra,* 414 *U.S.* at 235–36, 94 *S.Ct.* at 477, 38 *L.Ed.*2d at 440–41.

In addition, as noted *supra* at 204, 642 *A.*2d at 957, police officers are authorized under the "automobile exception" to make warrantless searches of vehicles that they have stopped on the highway whenever they have probable cause to believe that a vehicle contains contraband or evidence of a crime. *Alston, supra,* 88 *N.J.* at 230–31, 440 *A.*2d 1311. Because probable cause "is the constitutionally-imposed standard for determining whether a search and seizure is lawful" and "occupies a position of indisputa-ble significance in search and seizure law," *Novembrino, supra,* 105 *N.J.* at 105–06, 519 *A.*2d 820, vehicle searches sustainable under the "automobile exception" and based on probable cause stand on firmer ground than those that depend for their validity on a judicially-created exception to the warrant requirement, such as the *Belton* rule, which requires no proof of probable cause.

Moreover, under circumstances in which police officers possess a reasonable belief that a vehicle's driver or occupants pose a threat to their safety, a weapons search of the vehicle is permissi-ble in accordance with *Long, supra,* 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201. *See Lund, supra,* 119 *N.J.* at 48, 573 *A.*2d 1376. Even if a police officer errs in the "split-second" decision whether a reasonable basis exists for a weapons search, the officer cannot be held liable for a good-faith error, *see Kirk v. City of Newark,* 109 *N.J.* 173, 536 *A.*2d 229 (1988), and thus the only adverse consequence to the officer is that evidence of crime uncovered by the search may be suppressed.

Finally, in the event of an arrest for a traffic offense in which the arrestee remained in or adjacent to the vehicle, with the result that the vehicle was within the area of the arrestee's "immediate control," *Chimel, supra,* 395 *U.S.* at 762–63, 89 *S.Ct.* at 2040, 23

*L.Ed.*2d at 69, a contemporaneous search of the vehicle could be sustainable under *Chimel*, but not based on *Belton's* automatic application of *Chimel.*

On this record, however, the search of Grass's vehicle following his arrest depends entirely on whether *Belton* applies, no one suggesting that the search was based on probable cause to believe that the vehicle contained contraband or evidence of crime or on the officer's reasonable belief that Grass or the occupants posed a threat to his safety. Accordingly, because we hold that the *Belton* rule cannot sustain the search, the evidence of cocaine found in Pierce's jacket must be suppressed.

We acknowledge the virtue of simple, straightforward rules to guide police officers in applying Fourth Amendment doctrine. Nevertheless, we are convinced that automatic application of the *Belton* bright-line rule to authorize vehicular searches incident to all traffic arrests poses too great a threat to rights guaranteed to New Jersey's citizens by their State Constitution, and that that threat to fundamental rights outweighs any incidental benefit that might accrue to law enforcement because of the simplicity and predictability of the *Belton* rule.

The judgment of the Appellate Division is reversed and the cause remanded to the Law Division.

HANDLER, J., concurring.

This case requires the Court to determine the proper scope of a search incident to the arrest of a driver for operating a van with a suspended license. A Manalapan Township Police Officer stopped Nicholas Grass for speeding. The officer determined that Grass's driver's license had been suspended and placed him under arrest. The officer handcuffed Grass and put him in the back seat of the patrol car. The officer then proceeded to search the van. Defendant, Eileen Pierce, was a passenger. The search revealed cocaine in articles of clothing belonging to Pierce that were inside the vehicle. She later pleaded guilty to possession of cocaine after

the court denied her motion to suppress the cocaine found during the search of the vehicle and its contents.

The issue posed by this appeal, as I view it, is whether the police may search articles contained inside the passenger compartment of the vehicle after the driver, arrested for a motor-vehicle-laws violation, is physically restrained, removed from the area of his vehicle, and placed in a patrol car.

The Court now holds "that under article I, paragraph 7 of the New Jersey Constitution, the rule of *Belton* [*New York v. Belton*, 453 *U.S.* 454, 101 *S.Ct.* 2860, 69 *L.Ed.*2d 768 (1981)] shall not apply to warrantless arrests for motor-vehicle offenses." *Ante* at 209, 642 *A.*2d at 959. The Court instead apparently relies on *Chimel v. California*, 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.*2d 685 (1969), to reject the validity of the vehicle search maintaining that "when an arrestee, as was the case with Grass, has been handcuffed and placed in the patrol car, and the passengers are removed from the vehicle and frisked, the officer's justification for searching the vehicle and the passengers' clothing and containers is minimal." *Ante* at 211, 642 *A.*2d at 961.

Because *Belton* applies *Chimel* to a search of the passenger compartment of an automobile, and because the search in *Belton* was "a contemporaneous incident of the arrest," unlike the search in this case, and is, therefore, distinguishable, I disagree with the Court's need to reject *Belton*. I would accept *Belton* and apply it narrowly consistent with the *Belton* Court's own stated intention to remain faithful to the principles of *Chimel*.

Because all custodial arrests pose a threat to the safety of the arresting officer, I also disagree with the Court's suggestion that the rationale for *Chimel* "is less persuasive when offered to justify the need for a vehicular search following an arrest for a traffic offense." *Ante* at 210, 642 *A.*2d at 960.

However, because I believe the search was invalid under both *Chimel* and *Belton*, I agree with the result reached by the Court in this case.

## I

"It is the fact of the lawful arrest [that] establishes the authority to search." *United States v. Robinson,* 414 *U.S.* 218, 235, 94 *S.Ct.* 467, 477, 38 *L.Ed.*2d 427, 441 (1973).

> It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the *person* of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee.
>
> [*Id.* at 224, 94 *S.Ct.* at 471, 38 *L.Ed.*2d at 434.]

*Chimel* expounds the meaning and scope of the second proposition.

*Belton* purports to be an application of the *Chimel* standard, not a reformulation of that standard. "Our reading of the cases suggests the generalization that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably within 'the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m],'" *Belton, supra,* 453 *U.S.* at 460, 101 *S.Ct.* at 2864, 69 *L.Ed.*2d at 774–775 (quoting *Chimel, supra,* 395 *U.S.* at 763, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694). "Our holding today does no more than determine the meaning of Chimel's principles in this particular and problematic context. It in no way alters the fundamental principles established in the Chimel case regarding the basic scope of searches incident to lawful custodial arrests." *Id.* at 460 n. 3, 101 *S.Ct.* at 2864 n. 3, 69 *L.Ed.*2d at 775 n. 3. Thus *Chimel* remains the controlling source of analytical principles.

In this case, a finding that the challenged search violates *Chimel* would not be inconsistent with the holding in *Belton.* Thus I disagree with the Court's suggestion that accepting *Belton* would require supporting the validity of the search.

Under *Chimel* the area that the police can search incident to an arrest is that which is within the "immediate control" of the arrestee. In the context of an arrest involving occupants of a motor vehicle, *Belton* defines that physical area to include the

passenger compartment. Accordingly, the Court in *Belton* held "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of the arrest, search the passenger compartment of that automobile." *Id.* at 460, 101 *S.Ct.* at 2864, 69 *L.Ed.*2d at 775. Because *Belton* applies *Chimel,* and does not purport to alter *Chimel,* it in no way obviates the requirement that the searched area actually be within the immediate control of the arrestee.

In the context of an arrest associated with the use of a motor vehicle, when an arrestee remains near the vehicle, the entire passenger compartment is likely to be within the control of the arrestee. However, when an arrestee has been physically restrained, removed from proximity to the vehicle, and placed in the patrol car, typically the vehicle is no longer within the control of the arrestee. Further, under those circumstances, there is considerably less likelihood that the ensuing search will any longer be "a contemporaneous incident of the arrest." *Id.* at 460, 101 *S.Ct.* at 2864, 69 *L.Ed.*2d at 775. That is because "control" is the defining dimension of the reasonableness of the search, and its application necessarily turns on particular facts.

The element of "control" as the factor determining the reasonableness of a search incident to an arrest is to be understood in the sense of the physical and temporal capacity of the arrestee in light of surrounding circumstances. That understanding is exemplified by *Belton.* There, a sole officer searched the stopped automobile. Even though the officer had advised the four suspects that they were "under arrest," the suspects stood near the car while the officer searched it.

In contrast, the evidence in this case suggests that the search occurred after the arrest of the driver had been completed by his physical restraint and actual removal to the patrol car and, therefore, was not contemporaneous with the arrest of the driver, and that the area searched, the van, was no longer within the physical control of the arrestee. *See State v. Barksdale,* 224 *N.J.Super.* 404, 415–16, 540 *A.*2d 901 (App.Div.1988) (holding that

ten minute delay between arrest and search rendered search not "contemporaneous incident of the arrest within the contemplation of *Belton*").

Some federal courts that have considered the issue have held that under *Belton* the search of a vehicle incident to the arrest of a recent occupant is valid, even where the arrestee is handcuffed in the patrol car during the search. *See, e.g., United States v. White,* 871 *F*.2d 41 (6th Cir.1989); *U.S. v. Karlin,* 852 *F*.2d 968 (7th Cir.1988); *U.S. v. McCrady,* 774 *F*.2d 868 (8th Cir.1985). The Ninth Circuit, however, has held that a search could not be justified as incident to arrest where the arrestee had been handcuffed and placed in the rear of a patrol car for more than thirty minutes prior to the search. *U.S. v. Vasey,* 834 *F*.2d 782, 787 (1987). The *Vasey* court held that during the time that "elapsed between the arrest and the warrantless search, the *Belton* Court's fear of forcing officers to make split second legal decisions during the course of an arrest evaporated and took with it the right of the officers to enter the vehicle under the guise of a search incident to arrest." *Ibid.*

Those courts holding that *Belton* applies even when an arrestee is restrained and removed from the immediate vicinity of the vehicle have based their decisions on the *Belton* Court's desire to devise a rule that would provide a clear guide to law-enforcement conduct. Although I agree that *Belton* established a "bright line" by defining the passenger compartment of a vehicle to be within the "grabbable" area of a recent occupant of the vehicle, I am persuaded by the *Belton* Court's stated intention not to alter *Chimel* that the concept of control must still have real meaning and be applied in light of surrounding circumstances. I believe that *Belton*'s requirement that the search be a "contemporaneous incident of the arrest" provides that meaning and must be interpreted consistent with the analytical construct established in *Chimel.* Thus, a proper application of *Belton* requires a conclusion that the search in this case was not valid.

Moreover, this Court has endeavored to apply the standard of control as the operative factor in determining the reasonableness of a search incident to an arrest in the context of an arrest that involves the use of an automobile.

In *State v. Welsh*, 84 *N.J.* 346, 419 *A.*2d 1123 (1980), a majority of the Court rejected the search of the passenger compartment of an automobile as incident to an arrest for illegal gambling under the theory that the search was of an area not in the "immediate control" of the arrestee. That conclusion was grounded on the fact that the search had occurred while the arrestee was handcuffed in the patrol car. Because the arrestee was both restrained and removed, the Court concluded that the passenger compartment was no longer under the control of the arrestee. In *State v. Alston*, 88 *N.J.* 211, 235 n. 15, 440 *A.*2d 1311 (1981), we suggested that the result reached in *Welsh* appeared to be inconsistent with *Belton*. I now conclude that that suggestion was overstated. *See generally* David M. Silk, *When Bright Lines Break Down: Limiting New York v. Belton*, 136 *U.Pa.L.Rev.* 281, 313 (1987) (urging that *Belton* be read and applied narrowly). *Welsh* invalidated the search of the vehicle, not because the vehicle represented a physical area that was too broad, but rather because that area was no longer within the control of the arrestee and the search was therefore not contemporaneous with the arrest. As the Court noted in *Welsh*, "the arrestee's freedom of movement and the passage of time [are the] controlling factors." 84 *N.J.* at 355, 419 *A.*2d 1123.

In *Welsh* no one disputed the reasonableness of the arrest. I expressed the view that the challenged search was incident to a lawful arrest and was thus undeniably constitutional. *Id.* at 356, 419 *A.*2d 1123 (Handler, J., dissenting). In fact, the arrest itself in terms of the confinement and removal of the defendant was not completed; put differently, the arrest, having been completed, was in effect "undone." Following the defendant's arrest and removal, the police, prompted by the presence of the defendant's young child, freed him to drive his own car to the State Police barracks.

Because the return of the defendant to his car would clearly restore the passenger compartment to his control, I found the search that was undertaken at that time to be valid under *Chimel. Id.* 84 *N.J.* at 358, 419 *A.*2d 1123.

Neither my reasoning in *Welsh* nor that of the Court foreclosed the conclusion that under other circumstances, such as those in *Belton,* the entire passenger compartment might be amenable to a search incident to an arrest.

## II

The Court maintains that it does not "reject [ ] the rationale of *Chimel,* but *Belton*'s automatic application of *Chimel* to authorize vehicular searches following all arrests for motor-vehicle offenses." *Ante* at 211, 642 *A.*2d at 961. The Court cannot mean that all vehicular searches stemming from motor vehicle arrests are automatically validated under *Belton* regardless of circumstances. In fact, the Court correctly states that "in the event of an arrest for a traffic offense in which the arrestee remained in or adjacent to the vehicle, with the result that the vehicle was within the area of the arrestee's 'immediate control,' [citation omitted], a contemporaneous search of the vehicle could be sustainable under *Chimel.*" *Id.* at 42.

Nevertheless, the Court elsewhere maintains that the rationale for *Chimel* is "less persuasive when offered to justify the need for a vehicular search following an arrest for a traffic offense." *Ante* at 210, 642 *A.*2d at 960. I disagree with that assertion and its implication that the *Chimel* standard is not fully applicable to a search in the context of a motor vehicle arrest. The Court makes this statement despite its concession that "police officers are at risk whenever they make a vehicular stop, and that a significant percentage of assaults on police officers occur in the course of traffic stops." *Ibid.* We have previously made clear the danger associated with *all* custodial arrests. "Every arrest must be presumed to present a risk of danger to the arresting officer.... There is no way for an officer to predict how a particular subject

will react to arrest or the degree of the potential danger." *State v. Bruzzese,* 94 *N.J.* 210, 231, 463 *A.*2d 320 (1983) (quoting *Washington v. Chrisman,* 455 *U.S.* 1, 7, 102 *S.Ct.* 812, 817, 70 *L.Ed.*2d 778, 785 (1982)). "[W]e know from bitter experience that any arrest, regardless of the nature of the offense must be presumed to present a risk of danger to an officer." *Id.* 94 *N.J.* at 233, 463 *A.*2d 320. *See also State v. Smith,* 134 *N.J.* 599, 615, 637 *A.*2d 158 (1994) ("The safety concerns of a police officer unquestionably merit grave consideration."). In fact, the offense committed in this case is a perfect example of a motor vehicle offense that is sufficiently serious to pose an unquestionable danger. *See, e.g., Struck by a Suspended Driver, 3 in a Family Die, N.Y. Times,* May 3, 1994 at A1, B2 (describing spate of incidents in which pedestrians were killed by drivers with multiple license suspensions); *State Unable to Deal With Suspended Drivers, The Newark Star-Ledger,* May 23, 1994 at 1, 20 (reporting that motorists who drive after having their licenses suspended are flouting law and endangering others); *Scofflaw Kills, The Bergen Record,* May 19, 1994, at A1, A19 (reporting death of college professor ran over by man with record of five license suspensions).

The Court maintains that prior to *Belton,* it "did not sustain vehicular searches solely on the basis of arrests for motor vehicle violations." *Ante* at 213, 642 *A.*2d at 962. For that proposition the Court quotes *State v. Boykins,* 50 *N.J.* 73, 77, 232 *A.*2d 141 (1967): "Surely not every traffic violation will justify a search of every part of the vehicle." I agree with that statement; however, when a traffic offense is serious enough for an officer to justify a custodial arrest of the driver, a *Chimel* search is supported. In fact, the Court in *Boykins* stated that "if an officer decides to take a traffic violator into custody rather than to issue a summons, he may search the occupants and the car for weapons if he reasonably believes it necessary for his own protection or to prevent an escape." *Ibid.* Furthermore, *Boykins* was decided before *Chimel* and this Court adopted *Chimel* without limiting its application based on the type of arrest.

## III

The Court's ambivalence about the "persuasiveness" of *Chimel* in the context of arrests for motor vehicle violations concerns me. The Court discounts the potential risks associated with any custodial arrest.

Furthermore, I disagree with the Court's perceived need to reject *Belton.* The search here was invalid, under both *Belton* and *Chimel,* for the straightforward and narrow reason that it was not a "contemporaneous" incident of the arrest and the passenger compartment was no longer within the "immediate control" of Grass once he had been physically restrained and removed and placed in the patrol car.

Accordingly, I concur in the judgment of the Court.

HANDLER and GARIBALDI, JJ., concur in the result.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.