294 N.J. Super. 619 (1996)
684 A.2d 92
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THEODORE DICKEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 1, 1996.
Decided November 7, 1996.
*621 Before Judges DREIER, D'ANNUNZIO and NEWMAN.
Susan L. Reisner, Public Defender, attorney for appellant (Jacqueline E. Turner, Assistant Deputy Public Defender, of counsel and on the brief).
Charles R. Buckley, Deputy Attorney General, Acting Bergen County Prosecutor, attorney for respondent (Annmarie Cozzi, *622 Special Deputy Attorney General, Acting Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by DREIER, P.J.A.D.
Defendant, Theodore Dickey, appeals from convictions of first-degree possession of CDS (cocaine) with intent to distribute, N.J.S.A. 2C:35-5a(1) and -5b(1), and third-degree possession of CDS, N.J.S.A. 2C:35-10a(1). Defendant's motion to suppress the cocaine discovered and seized by the police was denied, and he pled guilty to first-degree possession with an expected dismissal of the other possession charge and a recommended maximum term of ten years with a three and one-third-year parole disqualifier. When defendant appeared for sentencing, the judge downgraded the offense for sentencing purposes to one of the second-degree and sentenced defendant to a seven-year term with a two and one-third-year parole disqualifier, plus the usual fees and penalties. Defendant has served virtually all of his parole disqualifier term, since he had a 434-day jail credit at the time of his April 21, 1995 sentencing. We are informed that he is in a halfway house at the present time.
On February 12, 1994, at 10:36 p.m., defendant was the passenger in an automobile with Ohio license plates traveling on I-95 southbound. The vehicle was clocked by a state trooper at thirty-four miles per hour, twenty-one miles per hour under the speed limit, with the driver making some erratic movements back and forth over the lane divider line. The trooper activated his lights and pulled the car over onto the left shoulder of I-95. Codefendant, Dion Parker, was driving, and defendant was in the front passenger's seat. According to the trooper, both defendant and the driver were extremely nervous. Mr. Parker produced his driver's license but could not find the registration or insurance card for the vehicle. His hands shook as he turned over the license. His eyes were bloodshot and red, although a sobriety test proved negative for evidence of alcohol. Defendant moved about *623 in the car and repeatedly turned around. The trooper testified that his suspicions were aroused and that he asked both men to get out of the car. Defendant began pacing and waving his hands. He also made some "laughing-coughing" noises. When the trooper asked about ownership of the vehicle, defendant stated that "Leon" owned the car but that defendant did not know the car owner's last name or address. Defendant first explained that "Leon" was his cousin and then later described him "like a nephew". Neither defendant nor the driver knew Leon's full name or his address. When the trooper asked co-defendant why he was so nervous, co-defendant replied "Nothing is in the ride. I'm not nervous." When the trooper asked co-defendant why he stated that "nothing is in the ride," co-defendant stated that nothing was in the trunk, and then co-defendant stated that he meant the car. Defendants also gave inconsistent stories concerning where they had been earlier in the day. At this time, both defendant and Parker refused to sign a "Consent to Search" form.
The trooper then began a search of the interior of the car, looking for the missing credentials. He also ran a stolen car check, and was informed that there was no report of the car being stolen. At that point, the trooper stated that he asked the two men to accompany him to the State Trooper Barracks in Totowa and that they both complied with his request. A tow truck brought the car to the barracks. Both men were handcuffed in the police car on the way.
Suspecting that drugs might be concealed in the car, the trooper called from the scene of the stop for the assistance of a K-9 officer, who subsequently met the trooper at the station and brought a drug-sniffing dog to examine the trunk of the car. The officer conceded that the two men were not free to leave until the investigation had been completed. At this time, the trooper had been able to acquire the name and address of the owner of the car, but was unsuccessful in his attempt to contact him at his address in Cincinnati, Ohio.
*624 The K-9 officer, accompanied by his dog, arrived at the barracks some time between 1:00 a.m. and 2:00 a.m., between two and one-half and three and one-half hours after the initial stop. While sniffing the car's exterior, the dog began scratching at the trunk, indicating that there was contraband located inside. At this time, probable cause existed for a search of the trunk. The K-9 officer began applying for a search warrant in full view of the two suspects. According to the officer, defendant then told him that he had nothing to hide and would sign a "Consent to Search" form. At 2:45 a.m., after being told that they were free to stop the search if they wished, both defendant and Parker signed the form. The K-9 officer opened the trunk and found a T.W.A. bag containing two brick-like objects, which a field test identified as cocaine. The cocaine found in the trunk weighed approximately two kilograms. The two men were then placed under arrest.
Defendant raises but one issue on this appeal:
POINT I
THE TRIAL JUDGE ERRED IN FAILING TO SUPPRESS THE EVIDENCE AS THE DEFENDANT WAS ILLEGALLY DETAINED PRIOR TO THE DISCOVERY OF THE DRUGS.
The trial judge separated his analysis into four issues: (i) whether the stop of the car was proper; (ii) whether the search and seizure of the occupants and the vehicle undertaken by the trooper was objectively reasonable; (iii) whether the length of the detention was objectively reasonable; and (iv)(a) whether the use of the narcotics dog constituted a search and (b) whether the consent obtained for the ensuing search was valid.
In addressing these issues, the judge concluded: (i) the stop was proper, based on the officer's observation that the car was traveling at a slow rate of speed; (ii) the search of the interior compartment of the car was reasonable, since the defendant had not produced any form of registration for the vehicle; (iii) the movement of the vehicle and its occupants to the police barracks was reasonable, as it enabled the officers to ascertain the owner of the car and to determine whether defendant or codefendant was authorized to operate it; and (iv) the sniff was not a search, and *625 the dog's alert gave the police probable cause to search the car; thus the subsequent consent given by defendant was valid.
Defendant here challenges only the reasonableness of the length of the detention. Defendant agrees that a police officer may stop a vehicle that is violating motor vehicle laws. Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); State v. Carter, 235 N.J. Super. 232, 561 A.2d 1196 (App.Div. 1989). Once stopped, the officer may also search the interior of the car for paperwork, such as the registration or an insurance card, if those items are not produced by the driver. State v. Jones, 195 N.J. Super. 119, 478 A.2d 424 (App.Div. 1984). A trunk, however, may not be opened without probable cause to search or absent valid consent. State v. Patino, 83 N.J. 1, 12, 414 A.2d 1327 (1980).
Under both the United States and New Jersey Constitutions, a police officer has the authority to detain individuals without a warrant on less than probable cause. In order to do so lawfully, the police must have reasonable and articulable suspicion that a person has been engaged, or is about to engage, in criminal activity. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986). Generally, the proper inquiry for determining the constitutionality of a search and seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent. State v. Kennedy, 247 N.J. Super. 21, 588 A.2d 834 (App.Div. 1991). The facts of our case gave the troopers such a reasonable suspicion. Defendant and the driver had given inconsistent stories concerning where they had been earlier in the day, the claimed permissive use of the vehicle was dubious at best, and the extreme nervousness of the men, with volunteered references to there being nothing in the trunk, all presented an articulable suspicion of illegal activity in relation both to the possession of the car and to the contents of the trunk.
*626 The question here is whether we can sustain the two and one-half to three and one-half hour detention period between the initial stop and the time probable cause to search arose as a result of the dog's actions. The United States Supreme Court has declined to "impose ... [a] rigid time limitation on Terry stops." United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985). The test to assess whether a detention is too long to be a valid investigative detention is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it is necessary to detain the defendant." Id. at 686, 105 S.Ct. at 1575, 84 L.Ed.2d at 616. Another factor to consider is "whether the police are acting in a swiftly developing situation, [because] in such cases the court should not indulge in unrealistic second-guessing." Ibid. We also must consider that the detention of the vehicle and of defendant may stand on different grounds. We note that the detention of defendant for the extended period did not lead in any material way to the discovery of the drugs. He made no incriminatory statement during his detention.
The issue as it relates to detention of the person is discussed at length in LaFave, Search and Seizure, § 9.2(f) (3d ed. 1996):
There is no general rule that the detention may continue so long as the reasonable suspicion giving rise to the stop remains, for if this were the rule some stops could be continued indefinitely. Rather, as the Supreme Court has repeatedly stressed, it must be asked whether the police are diligently pursuing a means of investigation which is likely to resolve the matter one way or another very soon and whether it is rather essential to the investigation that the suspect's presence be continued during the interval. This, in turn, may depend upon such things as the relative seriousness of the offense being investigated and whether the police are inching closer to having probable cause for arrest....
[Id. at 65-67 (footnotes omitted).]
Defendant relies on United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), to support the suppression of the cocaine obtained by the police in the present case. In Place, defendant's behavior first raised the suspicions of law enforcement officers in the Miami Airport. After defendant left Miami on route to New York, the authorities in Miami discovered discrepancies *627 in the address tags on his luggage and alerted New York authorities. DEA agents detained defendant when he arrived at La Guardia airport. Id. at 698-99, 103 S.Ct. at 2639-40, 77 L.Ed.2d at 115. They spoke with defendant and asked him to produce identification, which he did. Ibid. DEA agents ran a computer check that disclosed no offenses. They asked defendant to consent to a search of his luggage. When he refused, they seized his luggage. The agents told defendant that they were going to take his luggage to a federal judge to get a search warrant and that he was free to accompany them. Defendant declined to do so, and some ninety minutes later, the police subjected it to a sniff test by a trained narcotics detection dog. Ibid.
The Place Court held that the ninety minute detention was excessive, amounted to an unlawful detention, and was prohibited by the Constitution. The Court stated:
[W]e have never approved a seizure of the person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case. See Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
[462 U.S. at 709-10, 103 S.Ct. at 2645-2646, 77 L.Ed.2d at 122-123.]
The Court declined in Place to adopt the approach of ALI Model Code of Pre-Arraignment Procedure § 110.2(1) (1975) that provides that an officer may detain the person "for such period as is reasonably necessary for the accomplishment of the purposes authorized ..., but in no case for more than twenty minutes." (Emphasis added). In rejecting the adoption of the ALI Code approach, the Court stated:
We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.
[462 U.S. at 709, 103 S.Ct. at 2646, 77 L.Ed.2d at 122 (1983).]
Although the Court did not adopt such a rigid time limitation, the Court recognized that an investigative detention of property must be limited in its scope. The Court concluded:
[W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of Terry and its progeny *628 would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.
[Id. at 706, 103 S.Ct. at 2644, 77 L.Ed.2d at 120 (1983).]
Thus, Place does not stand for the proposition that a ninety-minute or longer detention of property is per se illegal. The Court expressly refused to adopt any "outside time limitation for a permissible Terry-stop ..." Id. at 709-10, 103 S.Ct. at 2646, 77 L.Ed.2d at 122.
Further, the defendant in Place urged that the detention of an owner's property is to be governed by the same rules as detention of the person. Id. at 705, 103 S.Ct. at 2643, 77 L.Ed.2d at 119. The Court responded:
We disagree. The intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent. The seizure may be made after the owner has relinquished control of the property to a third party or, as here, from the immediate custody and control of the owner. Moreover, the police may confine their investigation to an on-the-spot inquiry  for example, immediate exposure of the luggage to a trained narcotics detection dog  or transport the property to another location. Given the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime.
[Id. at 705-07, 103 S.Ct. at 2643-44, 77 L.Ed.2d at 119-20.]
After determining that the canine "sniff" was not a search, the Court analyzed the detention of the luggage and its intrusive effect on the defendant's travels. It found that because the disruption of defendant's travel plans equated with detention of his person, the same rules should apply. Id. at 708-09, 103 S.Ct. at 2645-46, 77 L.Ed.2d at 121-22. The Court determined:
At least when the authorities do not make it absolutely clear how they plan to reunite the suspect and his possessions at some future time and place, seizure of the object is tantamount to seizure of the person. This is because that person must either remain on the scene or else seemingly surrender his effects permanently to the police.
[Id. at 708 n. 8, 103 S.Ct. at 2645 n. 8, 77 L.Ed.2d at 122 n. 8 (quoting 3 W. LaFave, Search and Seizure § 9.6, p. 72 (Supp. 1982)).]
But while Place establishes that the diligence with which the police pursue the investigation is critical to assessing the reasonableness *629 of an investigative detention, ibid., there must be some limits even to bona fide investigatory detentions of property. Unlike the case before us, the property in Place was clearly owned by defendant. There was no necessity, as in our case, to determine whether defendant had a right to its possession. Here, the car was already being held because the driver did not possess a valid registration certificate. Thus, defendant's separation from his means of travel was dependent upon the resolution of the driver's right to possess the vehicle, an issue discussed infra.
LaFave also discusses several cases of permitted detentions of property lasting from fifteen to sixty minutes, often to obtain a narcotics-sniffing dog, although the courts have often rejected longer detentions. LaFave, supra, at 66 n. 184. However, a detention of over one hour was sustained in United States v. Richards, 500 F.2d 1025 (9th Cir.1974). LaFave concludes:
It would seem that a detention longer than that in Richards would seldom, if ever, be justifiable on less than probable cause.
[LaFave, supra, at 68.]
The one exception cited by LaFave is the detention of individuals in
the remarkable case of State v. Chaffee, 285 S.C. 21, 328 S.E.2d 464 (1984), upholding a 5-hour detention of two defendants suspected of a burglary-rape-murder-arson spree. The court commented: "The reasonableness of an officer's conduct and detention is related to all of the circumstances including the nature of the crime. Here, it was evident that the worst of crimes had been committed; the suspicion, even if short of probable cause, was great."
[Id. at 68 n. 193.]
Other theories support the length of the detention of the car before the dog-sniff was conducted. In United States v. Rodriguez-Morales, 929 F.2d 780 (1st Cir.1991), a prosecution for possession of cocaine with intent to distribute, the district court had suppressed evidence found in the search of an automobile. The First Circuit held that when both driver and passenger lacked valid drivers' licenses, the decision to remove their car to the state police barracks was a reasonable exercise of the community caretaking function, regardless of whether there was any lawful arrest of the driver. The court stated:

*630 [T]he law provides that, so long as the police act reasonably in carrying out their community caretaking function, they can impound the vehicle even though probable cause to search it, or to arrest the driver, may be lacking.
....
... Because of the ubiquity of the automobile in modern American civilization, and the automobile's nature  mechanically delicate, highly mobile, safely operable only by trained and licensed individuals  the police are constantly faced with dynamic situations, no two quite identical, in which they, in the exercise of their community caretaking function must interact with car and driver to promote public safety.
....
Framed precisely, the critical question in cases such as this is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason. The inquiry of reasonableness always necessitates constructing a balance among competing interests.
[Id. at 784-786.]
See also United States v. LaFrance, 879 F.2d 1 (1st Cir.1989) (upholding a two hour and fifteen minute detention of a package).
Objective reasonableness is the key criterion by which we review the trooper's actions. The record reveals that the trooper here investigated three separate police matters: (1) who owned the car; (2) whether defendant and codefendant were authorized to use the car; and (3) whether the car contained contraband. He quickly determined the name of the car's owner, and his efforts to locate the owner proceeded simultaneously with his attempt to secure the use of a narcotics-sniffing dog. The trooper in this case was aware that an investigative stop could not continue indefinitely, and he proceeded diligently. Even before he left the scene of the stop, the trooper summoned the K-9 officer to meet him at the Totowa barracks. The investigating trooper could not call the dog to the scene or investigate defendants' authority to use the car at the scene because he was concerned for the safety of all involved. Therefore, time was lost because of the process of calling the tow truck and transporting all concerned to the barracks. The trial judge adequately summarized those factors which justified the detention of the car at the station:

*631 In the case at bar, other reasons are present that justify detention of the vehicle. Here, the trooper detained the vehicle because its occupants did not have a registration, they could not identify the owner of the vehicle, later had given conflicting stories, and [because of] the question ... that this vehicle could not be left at the scene because it was on the left hand shoulder next to the high speed lane on the New Jersey Turnpike. It was dark, the road was wet, and in fact they were predicting a storm for that night or the next morning. Leaving the vehicle would have ... created a hazard for other travelers.
Once at the barracks, the trooper immediately tried to obtain a telephone number for the owner of the car and also contacted the Cincinnati police department to ask for their assistance. When he determined that neither defendant nor the driver had proof of anyone's permission to possess the vehicle, the trooper had a duty to seek verification of their authority to use the car. See N.J.S.A. 39:3-17, -29; 39:10-6.[1] So long as the ongoing efforts to locate the owner were reasonable, the temporary detention of the car can and will be upheld. Ultimately, however, the trooper was unable to contact the owner within a reasonable time. By that time, the dog was made available and probable cause existed for defendant's arrest.
As noted in our statement of facts, defendant had been handcuffed when he was transported to the State Police barracks, but then apparently was free to leave since he was not under arrest. The temporary restriction on defendant's freedom while riding in the trooper's car falls within a gray area as to whether he was arrested.[2] But even if defendant had been illegally arrested, *632 such arrest yielded no evidence that aided the State in defendant's prosecution, and the arrest would thus have not barred his future prosecution. As the Supreme Court held in United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), "[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction.... [T]he illegality of [the] detention cannot deprive the Government of the opportunity to prove [defendant's] guilt through the introduction of evidence wholly untainted by the police misconduct." Id. at 474, 100 S.Ct. at 1252, 63 L.Ed.2d at 547-48. See Kevin G. Byrnes, New Jersey Arrest, Search & Seizure § 33:4 (1966). Thus, irrespective of the legality of the troopers having handcuffed defendant while traveling to the barracks, the prosecution was lawful.
Defendant turns to New Jersey law, which must be examined to determine whether the State affords greater rights than those defined by federal law. He relies on State v. Cancel, 256 N.J. Super. 430, 607 A.2d 199 (App.Div. 1992), certif. denied, 134 N.J. 484, 634 A.2d 530 (1993). In Cancel, the defendant was stopped at the Newark Airport after picking up her suitcase. A dog had signaled that the bag probably contained drugs as it was being placed on *633 the airport's conveyor belt. The police immediately seized the bag. Id. at 433, 607 A.2d 199. In upholding the search, the court held that the use of the dog was not a search and that the positive reaction of the dog plus various inconsistencies in the defendant's stories provided probable cause to search the luggage. Id. at 433-435, 607 A.2d 199. Thus, New Jersey law coincides with that expressed in United States v. Place, supra.
To support suppression of the evidence, defendant points to the following statement in Cancel:
Moreover, the police used the dog to sniff for narcotics before the defendant was in any way detained. Thus it cannot be said that she was detained without reasonable suspicion. Had she been detained without reasonable suspicion until a narcotics-sniffing dog was brought to the scene an argument could have been made that the detention was unlawful and the evidence later uncovered should be suppressed.

[Id. at 435, 607 A.2d 199 (emphasis added).]
However, defendant's reliance on this language is misplaced. This dictum does not directly affect the present case because the record supports the finding that the trooper was acting on reasonable suspicion when defendant and the driver were held until their right to the possession of the car could be established. Probable cause is not required.
Defendant also relies on State v. Lund, 119 N.J. 35, 573 A.2d 1376 (1990), to support the proposition that nervousness alone cannot provide probable cause. We agree. But this case was not based solely on defendant's nervousness. Nor is the nervousness being used to provide probable cause, although it does supply one of several bases for the trooper's reasonable suspicion. The trooper could rely on the various additional factors noted earlier to support the detention. As the Lund Court stated:
Obviously there are some cases in which "furtive" movements or gestures by a motorist, accompanied by other circumstances, will ripen into a reasonable suspicion ... or probable cause to believe that the person possesses criminal contraband. Examples of such factors are additional evasive action, lying to the police, the presence of other incriminating information about the motorist or occupants of the car, the absence of identification, and even the lateness of the hour.
[Id. at 48, 573 A.2d 1376.]
*634 In Lund, the Court also considered what standard an officer should be held to when considering whether he has acted reasonably under the circumstances:
[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or `hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.
[Id. at 45, 573 A.2d 1376.]
Because defendant and the driver could not support their claim to rightful possession of the vehicle, the police properly detained it while checking for defendant's authorization. See State v. Halstead, supra. In Halstead, after lawfully stopping a rented truck on a New Jersey highway in order to ascertain the identity of the occupants and to obtain the registration for the truck, New Jersey officers discovered that the driver could not produce a valid registration. The Rhode Island Supreme Court held that the officers were entitled to order both occupants to leave the truck and to arrest the driver for that offense. The court also held that since the truck was parked in the travel lane of the New Jersey highway, it posed a hazard to other traffic. Therefore, the New Jersey police officers who lawfully stopped the truck and arrested its occupants were obliged to have the truck removed and impounded.
Finally, the present case is distinguishable from State v. Pierce, 136 N.J. 184, 642 A.2d 947 (1994), where the Supreme Court held that the warrantless arrest search standard announced in New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), would not withstand review under the New Jersey Constitution. Pierce, 136 N.J. at 208, 642 A.2d 947. The Court noted that its holding in Pierce meant it was not authorizing "vehicular searches indiscriminately based only on contemporaneous arrests for motor-vehicle violations." Id. at 209-10, 642 A.2d 947. Here, however, the detention was justified because the officer was acting on reasonable suspicion when he detained defendant and the driver until he could verify that they had a right to possess the vehicle.
*635 In sum, we here distinguish between the detention of property lawfully possessed by a defendant and property whose lawful possession must be verified. In the latter case, the temporary impoundment of the property does not intrude upon the defendant's rights to the same extent as the withholding of a defendant's acknowledged property. At least where motor vehicles are concerned, defendants can avoid this result by having in their possession the registration documentation required by law. From the totality of the circumstances, it is clear that the troopers had reasonable suspicion that the driver and defendant had no right to the car and that something was amiss concerning the contents of the trunk. The troopers properly continued their attempt to find the owner, to ascertain the driver's and defendant's authority to possess the vehicle, and to bring the drug-sniffing dog to the station to determine whether drugs were present in the trunk. The trial judge properly found that these efforts were of a reasonable duration.
Affirmed.
NOTES
[1] The police had cause to arrest the driver for violation of these statutes. State v. Halstead, 414 A.2d 1138 (R.I. 1980) (discussing New Jersey law). Defendant, however, was merely a passenger. But defendant as a passenger could not affect the detention of the car so long as he made no claim of ownership of the vehicle or a documented right to its immediate possession.
[2] The use of handcuffs in a Terry stop has been approved in only a limited number of cases, such as where a defendant "had threatened to kill someone and was acting violently," United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir.1993), or where the police were badly outnumbered, United States v. Miller, 974 F.2d 953, 957 (8th Cir.1992). In other situations, the use of handcuffs, where not necessary to avoid a tangible threat of violence, converted a Terry stop to an arrest. See United States v. Codd, 956 F.2d 1109, 1111 (11th Cir.1992).

We have found no case where the temporary handcuffing of a detainee solely during transportation in a patrol car has been found to constitute an arrest. Here, two detainees were being driven to the State Police barracks. The trooper-driver in such a situation may feel the need to restrain the passengers, even if they are being subjected only to a brief investigative detention rather than being arrested. "[T]he determination of whether an arrest has occurred is not dependent on whether the citizen is formally placed under arrest...." United States v. Hardnett, 804 F.2d 353, 356 (6th Cir.1986), cert. denied, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987). Rather, the test is whether the detainee is "free to leave" once the Terry investigation was concluded. Florida v. Royer, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 239 (1983) (citation omitted). As noted, once the detainees reached the State Police barracks, there was no indication that defendant was restrained and was not free to leave, although both his companion and their vehicle were properly held pending the results of the investigation.